Our third case for this morning is United States v. McClellan. And we'll hear first from Mr. King. Good morning, Your Honors. Scott King on behalf of the appellant along with my associate, Lakeisha Murdoff. As of October of 2008, Michael and Tina McClellan, and Michael alone has appealed the verdict, the judgment in this case. They were operating in Calumet City, Illinois, a daycare. And in October of 2008, they decided to spend $2.8 million and buy a restaurant in the northern district of Indiana, which they did. They bought the restaurant from a family of restauranteurs and kept on contract two members of that family, continuing the operation. About October of 2009, there was an approximate residence. They purchased that. But let's focus. The time is short, as always. And he's here on two things. He's here on the fraud with respect to the daycare center in Illinois and also for harboring undocumented workers in that house. Actually, three things, Judge. And it's money laundering from proceeds of fraud. Harboring mail fraud and money laundering. Correct. And then there's a fraud with regard to underreporting, underpaying. Right. So the money laundering is taking the money from the daycare to use it to purchase the restaurant and the house. Yes. No, not the restaurant. I'm sorry. The house. Just the house. Okay, fine. So harboring. Why isn't this exactly like the example that we gave earlier in our Costello decision? There's evidence in the record that could be believed that he knows these are undocumented workers. They're living in this house behind the restaurant. He's not charging them any money. There's some evidence suggesting they're paid very low wages. They're not included on the Indiana forms. Why isn't this all evidence that would show harboring? The end of the example the court just cited to him, Costello, in the opinion states, it is nonetheless harboring in an appropriate sense because the illegal status of the alien is inseparable from the decision to provide housing. It is a decision to provide a refuge for an illegal alien because he's an illegal alien. What distinguishes this case on that is, first of all, he buys into an existing business which includes existing employees. It is not until some months later he has purchased the house. The evidence from the government within that house were people that were illegally in the country. They were people that were legally in the country. There were people that were illegally in the country and working at the restaurant he bought. The same with legally, but there were also people, both illegally and legally in the country, that were working at other places owned by the entity that he had purchased this restaurant from. I believe that's the distinction with a difference in this case. Unlike the hypothetical, if you will, of the Chinese restaurant, that's assuming the person operating the restaurant, providing the housing, with knowledge of the illegality of the presence of the employees. That's all in one grouping. I'm looking at instruction number 18, which is at the end of your brief, and that's where the district court defined the term harbor for the jury. He says to harbor an alien means to provide a known alien with a secure haven, a refuge, or a place to stay where it's unlikely that the authorities will be seeking him. We have the Bastida testimony saying that he knew they were undocumented. Some of them, and it doesn't have to be all of them, it could be one. The harboring violation doesn't involve a large number, does it? Well, actually, the harboring violation as indicted involved five specific individuals identified in the actual indictment as, well, the initials are there under the bold denomination of my client's name. So actually it required proof. Paragraph 2 of the indictment, FMR, FCR, et cetera, et cetera. That's correct. That's what I was referring to, Your Honor. But, you know, the jury finds this. The jury gets a definition of harboring that includes known alien remaining in the United States in violation of the law, so not a known alien who's lawfully here. Doesn't that capture the essence of this? I don't think so, and I think the facts here are in contrast not only to Costello, but they're in contrast to the case that's fairly significantly relied upon by the government, that of Campbell. Campbell, of course, is the pimp who seeks out illegal aliens, begins them in massage parlors and nice living accommodations with no requirement of engaging in sexual activity, and then that degenerates by his design. It degenerates into seizing any documentation they may have, restricting where they're living, putting them up, and the court there found this was, because this was integral to his overall plan of operation, that the evidence there was sufficient. That's not this case. In this case, on the point you earlier raised with respect to what is provided in final instruction number 18, we then back into the plain error argument we're making with regard to instruction number 17 and the failure of that instruction to, well, to at all describe to the jury and provide for the jury the requirement of the requisite mens reis. And we think certainly in combination that what Mr. McClellan suffered as a result was a conviction on the harboring accounts that he should not have. We think these issues are intertwined. We do think it was plain error, despite, sadly, my failure to object to instruction number 17. But I really think that the facts in this case are what distinguished the conviction from either of the most down-point precedents this court has come down with. And when you combine his taking over, when you combine the mix of individuals, not only in terms of status in the country, but in terms of where they're employed, that we start I mean, let's go back to the instruction for a second. There is no uniform rule at the moment in the courts of appeals that says you have to have this kind of specific intent instruction. And what worries me is that, especially on plain error review, when you look at the instructions as a whole, don't you come up with something awfully close to what you're arguing for? I didn't... Well, combining the definition of harboring with the instruction number 17, combining 17 and 18, you're very close to the kind of instruction that you think should have been given. Maybe that's why you didn't object. No, I don't think so. I wish I had a better memory of why I didn't object. When we look at what the known reference is to a known alien, actually it doesn't even say illegal alien. But then you get into 17, and 17 part 3 says the person's name in the indictment remained in the United States in violation of the law. So the jury has to find, the jury is told it has to find these people are in violation of the law. Yes, Your Honor, but instruction number 17, which is telling the jury, here are the elements you must find beyond a reasonable doubt, is silent as to the knowledge or intent required of the defendant. And so even though instruction, we read instructions as a whole, and even though 18 followed immediately on the heels of 17, we contend it does not cure the defect inherent in an instruction in an offense that's not a strict liability crime, that fails to even reference a requirement of a state of mind, be it knowledge, be it intent, be it whatever. Well, he has to know that they're not lawfully in the country. That's part 4. And the jury does have to find that he harbored as defined by the district court. Correct. So he takes these actions to give the secure haven. And this court, we get back again. You want a link. He took the actions because he was trying to help them stay here. Correct. Somewhere between Campbell and Costello, it appears to me as best I read these decisions, it's your focus if you're committing this crime. It's not just you're putting people in a house. You're doing this because you want to avoid detection. You don't want to lose the employees because of the impact it's going to have on your business. And if I may, I'd like to keep the balance of my time for rebuttal. Certainly. That's fine. Thank you, Judge. Ms. Chang-Adiga, is that somewhere close to the way you pronounce your name? May it please the court, Jennifer Chang-Adiga on behalf of the United States. So let me, while you're shuffling around, I'm troubled, among other things in this case, by the fact that so many of these undocumented employees were paid half cash, half check. It doesn't seem at all like the behavior of somebody who is trying to harbor to be writing checks to them. And the fact that they were getting a $5 per hour wage, although lower than the regular minimum wage, might not even be lower in a restaurant business. There are tip wages. There are other kinds of things. It's not clear to me that these facts add up. Your Honor, it's true that some of the employees were paid all in cash, according to the record. Some were paid half cash and half check, and some were paid all in check. We do know from the evidence that was presented at trial that many of the illegal alien employees did have false social security numbers. And we know from the testimony of Horacio Bastida and the undercover recordings that Mr. Bastida made that fact known to Mr. McClellan. And Mr. McClellan, in fact, even told Mr. Bastida to tell those illegal aliens to continue using those fake social security numbers, so if the event ever arose in the future, he would be able to claim that he did not know they were illegal. So does the evidence tie either the use of the false social security numbers or something else to the initials mentioned in paragraph 2 of the indictment? One or more aliens, namely, and then there are a bunch of initials. Your Honor, while there wasn't that specific link, the jury could have found that Mr. McClellan was in violation of the harboring statute and knew those men were illegal. And we know that from, as I mentioned before, the recorded conversations between Bastida and McClellan. He, being Mr. McClellan, stated repeatedly that he knew the men in the back or the Mexicans working in the back were illegal and was okay with that and continued to employ them. He was even told at one point that Mr. Bastida himself was illegal, and Mr. McClellan said, I didn't know that about you, but I'm okay with that. Mr. McClellan at one point told Bastida he did not want the guys in the back to punch in anymore on the electronic timekeeping system because that would keep a paper record, and instead they reverted to an old-fashioned system of time cards that could be easily destroyed. And then we have the conversation about the fake Social Security numbers and Mr. McClellan asking them to continue that practice so he could feign ignorance. Didn't they at the same time install some new computer system in the restaurant that was keeping various records? Yes, there was evidence that a computer system called the Aloha system was installed, possibly by McClellan, and basically the evidence was that Mr. McClellan directed Bastida and others who were using the computer system that any time they took cash out of the drawer, they were to enter that in the Aloha system under the heading of Mike's training mode, Mike being Michael McClellan. Although Mr. McClellan attempts to argue I couldn't have committed the acts that I'm accused of, basically siphoning cash from the restaurant to use for payroll because I installed this system, it really is sort of irrelevant or a red herring because we know from the evidence, which was fairly clear, that Horacio Bastida was directed specifically by McClellan to set aside cash receipts on a daily basis to use for payroll. In fact, McClellan wrote down on a sheet of paper how much money he wanted Bastida to set aside on each particular day of the week so he could meet his payroll requirements. So this actually feeds into your mail fraud of the Indiana Department of Workforce Development. It does, it does indeed. Mr. McClellan, in addition to the things I just mentioned, also directed Bastida to shred those cash receipts once he had set them aside, and we know obviously that he did not do that. He instead turned them over to law enforcement. And Bastida's testimony was corroborated because there was also video recordings of Bastida paying the employees in the back of the house with the cash that was indeed set aside by him and other managers who worked at the restaurant. And we know that Mr. McClellan took steps to conceal what he was doing because, as I mentioned before, he changed the entire system of timekeeping so as to better enable himself to commit this fraud, which he clearly had the intent to do and the jury found as such. Now, can you give me a good difference? This is a question left over from Costello, but it comes up here as well. A good way of distinguishing between concealing undocumented workers and harboring them? Well, we do know from Costello that this court, obviously in Costello, which cited the restaurant owner example, which, as this court said, and I would fully agree is very similar to the facts of McClellan's case, this court in that case said the owner, being the restaurant owner, does not house his illegal employees in order to conceal them, although that is one effect. He is reducing their interactions with citizens who might report them to the authorities. It is the perfect case of harboring. So I think that quote makes clear that one can harbor but not necessarily conceal, although the reverse may not be true. Just as McClellan did in this case, he harbored them because he was reducing their interactions with people in the public. The record showed that the house on St. John Road was across the parking lot from the restaurant, extremely close proximity, and so that, in effect, the workers were going across the parking lot back and forth to go to and from work and effectively were not meeting other citizens out and about in the public who might be able to learn their illegal status and therefore report them to law enforcement. So the indictment says one or more, so I assume the government's position must be showing that even one of these five indicated people would be enough to satisfy your burden. That is the government's position, yes, Your Honor. But you've said also at the same time that you haven't actually tied the evidence down to any one of them. I would say that, yes, in looking at the record, there was no specific evidence as to these five individuals, just that the jury could have found based on the evidence as a whole in its totality. Okay. If there are no further questions, I would ask that the court affirm the convictions of Mr. McClellan. Thank you very much. Okay. Anything further, Mr. King? Yes, Your Honor. Just to a moment on this ALOHA system that the court raised, not only the half cash, half check payment, but that ALOHA system. And ALOHA is not only relevant for the court's consideration on the counts two through four. It also has some relevance in terms of the circumstantial impact of my client's knowledge of the illegal status and the whole harboring issue. Why would he install a system, regardless of telling to keep some in cash aside to make payments, the system recorded all of the money coming in, in complete contrast to the practice he inherited. The split between going into the register and staying out in cash was clearly, by the previous owners, a game plan of skimming, for want of a better term. The ALOHA system installed by my client eliminated that because the record was kept on the system, regardless of whether any was set aside in cash. And the ALOHA system was seized by the government, and you can account in the record, this was one of the slowest-paced investigations. It began before my client had anything to do with this place, then a year later, and unfortunately in the intervening time he had purchased it, ICE picked it back up. Then they came for a search a long time before they ever indicted. They had seized the system by then, and the government was in possession of the system at that point. Even with this system in place, I understand the record to show that the forms that were sent to the Indiana Department of Workforce Development didn't include the undocumented employees. They didn't, but they didn't include the total of the amounts paid, because, at least in part, in terms of assimilating and collecting the data, that was in the possession of the government in the ALOHA system. Now, I'm not suggesting that in hindsight, certainly, other efforts couldn't have been made to try and recreate that to make sure of the accuracy being reported to Indiana. But I think the installation of the system, as well as the use of checks, at least stands in some contrast to what his intent was. Coming back to the knowledge of the illegal status, and I applaud the government for saying I think there was some significant lack there. For example, I do recall in the record, in the argument against our motion for acquittal at the end of the government's case, of the government suggesting, well, he knew some of them didn't speak English. And again, I don't think he was being derogatory, but that's not the level we can go to in terms of requiring adequate evidence on this issue. I appreciate the opportunity, and thank you, Your Honors. All right, thank you very much. Thanks to both counsel. We'll take the case under advisement.